IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| RYAN ALLEN BENNETT,            ) | |
|                                               ) | |
|            Plaintiff,                      ) | |
|                                               ) | |
| v.                                            ) | Action No. 2:17cv520 |
|                                               ) | |
| NANCY A. BERRYHILL,          ) | |
| Acting Commissioner,              ) | |
| Social Security Administration,  ) | |
|                                               ) | |
|            Defendant.                    ) | |
|                                               ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff Ryan Allen Bennett's ("Plaintiff") Amended Complaint, ECF No. 28, filed pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("SSA"). Plaintiff filed a Motion for Summary Judgment and memorandum in support, ECF Nos. 32-33, and the Commissioner filed a Cross Motion for Summary Judgment and memorandum in support, ECF Nos. 35-36, which are now ready for recommended disposition. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and

Local Civil Rule 7(J).   For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 32, be **GRANTED**, the Commissioner's Motion for Summary Judgment, ECF No. 35, be **DENIED**, and an Order be entered awarding Plaintiff disability benefits.

## I. PROCEDURAL BACKGROUND

On July 11, 2013, Plaintiff protectively filed his application for DIB and SSI, alleging an onset date of October 31, 2010, due to a learning disability, scoliosis, attention deficit hyperactive disorder, and slight speech impairment.  R. at 15, 58, 70-80, 91, 170-182, 202.  His application was initially denied on January 14, 2014, and again denied upon reconsideration on October 1, 2014. R. at 15, 58-101.  Plaintiff then requested a hearing in front of an administrative law judge, which was conducted on July 22, 2016. R. at 30-52.  The Administrative Law Judge William T. Vest, Jr. ("the ALJ"), issued a decision denying Plaintiff's DIB and SSI applications on August 15, 2016.  R. at 15-25.  Plaintiff then filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied by the Appeals Council on July 30, 2017.  R. at 1-5.  The Appeals Council denied Plaintiff's request for review because the Appeals Council found no reason under the rules to review the ALJ's decision, making the ALJ's decision the Commissioner's final decision. R. at 1.  At no time during the administrative process did Plaintiff argue or assert that ALJs are inferior officers subject to the Appointments Clause.

Having exhausted his administrative remedies, on October 2, 2017, Plaintiff filed his first complaint for judicial review of the Commissioner's decision.  ECF No. 3.  The Commissioner filed an Answer on December 22, 2017.  ECF No. 7.  The matter was referred to the undersigned U.S. Magistrate Judge ("the undersigned") on January 9, 2018.  ECF No. 10.  The Parties filed cross motions for summary judgment. ECF Nos. 12, 14.  On August 14, 2018, Plaintiff filed a

Motion for Leave to Amend Complaint and memorandum in support seeking to add Count II, which challenges the constitutionality of Commissioner's decision in Plaintiff's case. ECF Nos. 16, 17. The Commissioner filed a consent Motion for Leave to File Opposition to Plaintiff's Motion to Amend Complaint, ECF No. 19, which was granted, ECF No. 20. The Commissioner's Opposition to Plaintiff's Motion for Leave to Amend Complaint was filed on September 19, 2018. ECF No. 21. The Court then entered an Order setting a hearing on Plaintiff's Motion for Leave to Amend Complaint. ECF No. 18. Plaintiff filed a Motion for Extension to File Plaintiff's Rebuttal Brief, ECF No. 22, which the Court granted, ECF No. 23. The Court held a hearing on Plaintiff's Motion for Leave to Amend Complaint on September 20, 2018.[1] ECF No. 24. On October 9, 2019, Plaintiff filed a rebuttal brief, ECF No. 25, and on October 15, 2018, the Commissioner filed her reply, ECF No. 26. Thereafter on October 19, 2018, the Court granted Plaintiff's Motion for Leave to Amend Complaint and deemed Plaintiff's Amended Complaint ("Complaint") properly filed. ECF No. 27. On October 25, 2018, the Commissioner filed her Answer to the Complaint. ECF No. 29. On November 2, 2018, the Court granted the parties leave to file new cross-motions for summary judgment, ECF No. 30, after which the parties withdrew their earlier cross-motions for summary judgment. ECF Nos. 31, 34. On December 3, 2018, Plaintiff filed his second Motion for Summary Judgment and supporting memorandum, ECF Nos. 32-33, and on December 21, 2018, the Commissioner filed her second Cross-Motion for Summary Judgment and supporting memorandum, ECF No. 35-36. On January 4, 2018, Plaintiff filed a reply to the Commissioner's Cross-Motion for Summary. Therefore, the matter is now ripe for recommended disposition.

---

[1] This hearing was held jointly with another case involving the same issue. ECF No. 24.

## II. RELEVANT FACTUAL BACKGROUND

Plaintiff was born on August 2, 1985, and was twenty-five years old at the time of his alleged onset date of disability, making him a "younger individual" under the SSA's regulations. *See* R. at 32. *See also* 20 C.F.R. § 416.963(c) (defining anyone under the age of fifty as a "younger person."). On July 22, 2016, Plaintiff appeared, represented by Erick Bowman, Esq.[2] and testified before the ALJ at the administrative hearing. R. at 30, 33-42. The Plaintiff's mother, Karen Bennett, R. at 30, 42-48, and Linda Augins, an impartial vocational expert ("VE"), R. at 30, 48-51, also appeared and testified. The record included the following factual background for the ALJ to review:

### A. Plaintiff's Academic and Work History

In 1989, Plaintiff was first deemed eligible for special education services by Virginia Beach City Public Schools. R. at 246, 256-57. At age four Plaintiff attended a handicapped preschool and thereafter continued with special education through elementary, middle, and high school. R. at 208, 246, 256-57. In high school Plaintiff was mainstreamed for English but performed poorly in that class. R. at 208. Plaintiff was unable to pass the Standard of Learning test, necessary to obtain a regular high school diploma, and ultimately graduated high school with a Special Diploma in 2005. R. at 208, 256-57.

In 1999 Plaintiff was administered the Wechsler Intelligence Scale for Children – Third Edition ("WISC-III"), Wechsler Individual Achievement Test ("WIAT"), and the Development Test of Visual-Motor Integration ("VMI"). R. at 251. On the WISC-III, Plaintiff scored in the low average range for performance and verbal IQ and scored in the well below average/borderline range in all other categories. *Id.* Plaintiff also had a full scale IQ of 78, which falls in the well

---

[2] Plaintiff is now represented by John Goss, Esq.

4

below average/borderline range. *Id.* The evaluator noted "these results place [Plaintiff] in the well below average to low average range of potential." *Id.* On the VMI, Plaintiff scored in the very low range, demonstrating that Plaintiff "probably encounters significantly more difficulty than is typical for his age group with the mechanisms involved in paper and pencil types of tasks." *Id.* On the WIAT, Plaintiff demonstrated "significant academic weakness in the areas of reading, writing, and math . . . [which] fall well below the average range and well below grade level expectations." R. at 251-52.

A November 30, 2004 assessment for continued special education services indicated Plaintiff was receiving resource and vocational training in commercial food and that he was working toward a special education diploma. R. at 246. The evaluator identified problems with the legibility of Plaintiff's handwritten assignments unless Plaintiff is reminded to slow down and rewrite the assignment. *Id.* Plaintiff was provided extra time to complete assignments. *Id.* Plaintiff's academic achievement ranged from borderline to the extremely low range and, while Plaintiff was characterized as "diligent and cooperative" a "significant and unusual discrepancy between his ability and achievement was noted in the areas of reading, math, and written language." R. at 246-47. The assessment also indicated Plaintiff "had a job at Farm Fresh, but that his hours were gradually reduced until he had none on the schedule so [Plaintiff] quit." R. at 247.

From 2005 to 2010 Plaintiff worked at Pizza Hut as a food preparer. R. at 257. Plaintiff's responsibilities included making pizza dough, setting up ingredients, stocking the back of the restaurant with deliveries, and assisting delivery drivers with folding boxes. R. at 33. Pizza Hut began reducing his hours until he was only working 2-3 hours a week. R. at 33, 37, 257. Although unconfirmed by the employer, Plaintiff and his mother believe the reduction in hours was the result

of Plaintiff's inability to keep up with the pace of the work.  R. at 37, 41, 44, 257.  At some point during this employment Plaintiff moved and was no longer within walking distance from his job. R. at 33.  Thereafter, Plaintiff either took public transportation to work or a family member would drive him.  R. at 37.  Ultimately, Plaintiff quit his job at Pizza Hut because the significant reduction in his hours made the cost of traveling to and from work prohibitive.  R. at 37.

**B. Plaintiff's Function Report**

On September 4, 2013, Plaintiff's mother completed an Adult Function Report in which she indicated Plaintiff does some household chores, including mowing the lawn, raking leaves, pulling weeds, loading and unloading the dishwasher, and doing laundry with supervision.  R. at 209, 211.  Plaintiff can prepare quick and easy meals for himself including sandwiches, canned food, frozen entrees, and cereal.  R. at 11.  However, Plaintiff spends the majority of his time—10 to 12 hours a day—on his computer, playing video games, or watching television.  R. at 209, 213. Plaintiff's mother reported no problems with personal care, but that Plaintiff needs special reminders to brush his teeth, use deodorant, and take showers.  R. at 210-11.  Plaintiff was unable to pass driver's ed in high school and does not have a driver's license.  R. at 212.  Plaintiff gets around by walking or by car, goes to the grocery store with his mother once every two weeks for an hour, and has no income or bills.  *Id.*  According to Plaintiff's mother, he has difficulty completing tasks, concentrating, understanding, and following instructions.  R. at 214.  Plaintiff can follow instructions if the instructions are detailed and Plaintiff goes slow but has a harder time with spoken instructions because he has nothing to refer back to.  *Id.*

**C. Plaintiff's Medical Records**

On January 10, 2014, Plaintiff saw consultative examiner Rand Rhoad, Psy.D., for a mental evaluation and psychological testing.  R. at 257.  On mental status evaluation, Dr. Rhoad found

Plaintiff generally intact with some deficits in immediate auditory memory skills. R. at 258. Plaintiff's composite scores on the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV") was in the low average range. R. at 259. Plaintiff's scores were all in the low average range and Plaintiff's full scale IQ was also in the low average range. *Id.* Dr. Rhoad found no signs of exaggerated symptoms and determined Plaintiff was credible. R. at 260. Dr. Rhoad assessed Plaintiff had a learning disorder, adjustment disorder with depressed mood, personality disorder, and a global assessment of functioning ("GAF") of 55. *Id.* Dr. Rhoad concluded Plaintiff may be capable of performing simple repetitive work assignments, he likely would benefit from a job coaching program, and that he would "require a rather significant degree of extra supervision and assistance in performing of tasks on a consistent basis in the work environment." R. at 261.

On January 13, 2014, Patricia Bruner, Ph.D., a state agency psychological consultant, reviewed Plaintiff's medical records and concluded Plaintiff was limited in understanding and memory, concentration and persistence, social interaction, and adaptive limitations. R. at 64-65. She found Plaintiff was moderately limited in his ability to understand and remember detailed tasks, comprehend and recall complex directions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, following complex directions, complete a normal workday/week, work without some additional supervision, interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, interact with others, respond appropriately to changes in the work setting, and handle normal work stress. *Id.*

On September 30, 2014, David Deaver, Ph.D., reviewed Plaintiff's medical records and agreed with Dr. Bruner's assessment that Plaintiff could engage in simple, repetitive tasks on a routine basis. R. at 88.

**D. Hearing Testimony**

At the hearing Plaintiff testified that he lived in a home with his mother, aunt, and uncle. R. at 34. Plaintiff has never lived alone. R. at 42. Plaintiff testified he was unmarried, had no children, no income, and that his mother supported him. *Id.* Plaintiff testified he had a special diploma and did not have difficulty with simple math, reading, or writing. R. at 35. Plaintiff stated he was not on medication and was not being treated. R. at 38. Plaintiff has never had a driver's license. R. at 39-40. Plaintiff testified that at home he mowed the lawn, did the dishes, took out the trash, and picked up heavy things when asked. R. at 35, 39. Plaintiff enjoyed video games and played in excess of ten hours per day. R. at 39. Plaintiff stated he often forgot to maintain his hygiene and his mother would have to help him pick out clothes, remind him to brush his teeth, put on deodorant, and shower. R. at 41. Plaintiff discussed that at his former job at Pizza Hut he made pizza dough, set up ingredients, stocked the back of the restaurant with deliveries, and assisted delivery drivers with folding boxes. R. at 33. Plaintiff testified Pizza Hut kept reducing his hours. *Id.* Plaintiff believed the reduction in hours was because he was too slow. R. at 41. Plaintiff testified he used to live within walking distance from Pizza Hut but that he moved fifteen to twenty minutes away and that it cost money for him to get to work. R. at 33, 37. Plaintiff stated he ultimately quit that job and has not looked for a job since then. R. at 33-34.

Plaintiff's mother, Karen Bennett, also testified at the hearing. Ms. Bennett stated Plaintiff did not have a driver's license and she did not believe Plaintiff could live on his own or pay his own rent or bills. R. at 46. She believed Plaintiff would need a significant degree of extra

8

supervision to perform tasks in a work environment. R. at 47. She stated he has needed extra supervision his whole life and got extra supervision through special education. *Id.* Ms. Bennett testified that Plaintiff regularly forgot to do common hygienic tasks and that she often reminded Plaintiff to do those things. R. at 43. She stated she had to help him shave because he would often miss spots and not shave close enough. *Id.* She testified Plaintiff could pick out his own clothes, but that she would have to make sure his clothes matched and were not wrinkled. *Id.* She stated he only had a few chores, but that he often forgot to do them; once reminded, he would be able to complete them. R. at 44. Ms. Bennett stated Plaintiff's main chores included mowing the lawn and taking out the garbage. R. at 45. She testified that she had to make sure Plaintiff completed his chores correctly. R. at 45. For example, when Plaintiff took the garbage out she had to make sure he got all the garbage and the garbage bag was tied correctly, R. at 45, and when Plaintiff mowed the lawn she had to make sure Plaintiff has not missed spots, R. at 44. Ms. Bennett testified that Plaintiff was often confused when given general directions and does not know where to start unless told specifically what needs to be done. R. at 45. She testified that Plaintiff would get depressed and during these times Plaintiff would lay in bed, watch television, would not smile or joke, stay in his room, and isolate himself. R. at 46. Ms. Bennett discussed Plaintiff's past work at Pizza Hut, noting that Pizza Hut reduced Plaintiff's hours to one day a week. R. at 44, 48. Plaintiff told her his reduction in hours was because he was unable to keep up with the tasks they gave him. R. at 44. She testified that when Plaintiff first began working at Pizza Hut they lived within walking distance of his work. R. at 48. When they moved they moved farther away but still lived close enough that Plaintiff could take a single bus to get there. R. at 48.

At the hearing, the VE was presented with a total of three hypotheticals. The first hypothetical presented asked the VE to consider an individual with Plaintiff's age, education, and

work experience with a residual functional capacity ("RFC") allowing for medium work as defined in the regulations, except that individual should not engage in frequent pushing or pulling with lower extremities and no climbing, and that the individual be limited to simple, repetitive non-production job tasks without frequent interactions with either the general public or coworkers. R. at 49. The VE testified that such an individual could perform work as an order picker, a hand packager, or an office cleaner and that a significant number of such jobs existed in the national economy. *Id.* For the second hypothetical, the VE testified that, assuming the same hypothetical individual, but the individual needed a significant degree of extra supervision and assistance in performing tasks on a consistent basis in a work environment, there would be no jobs available. R. at 50. For the third hypothetical, the VE testified that, assuming the first hypothetical individual, but with only superficial contact with coworkers and the public, the individual could still perform the work of an order picker or hand packager. *Id.* Lastly, upon questions by Plaintiff's counsel, the VE testified that it would be considered sheltered employment if an individual needed a job coach or job coaching program to maintain that employment. R. at 50-51.

## III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if:

> (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past

relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.

*Strong v. Astrue*, No. 8:10-cv-00357, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law: First, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of October 31, 2010 through his date last insured. R. at 17. Second, the ALJ determined that Plaintiff suffered from the following severe impairments: learning disorder NOS, personality disorder, osteochondral lesion of the left ankle, and obesity. *Id.* The aforementioned impairments were found to be severe as they caused more than minimal limitations in the Plaintiff's ability to perform basic work activities. *Id.* To the extent that Plaintiff alleged other impairments, the ALJ found such impairments to be non-severe because they either did not exist for a continuous period of twelve months, were responsive to medication, did not did require any significant medical treatment, or did not result in any continuous exertional or nonexertional functional limitations. R. at 18.

With respect to Plaintiff's mental impairments, the ALJ found that when considered singly and/or in combination, these did not meet or medically equal the criteria of listings 12.02, 12.04, or 12.08. *Id.* Specifically, the ALJ found that Plaintiff's mental limitations did not satisfy

11

"paragraph B" criteria because Plaintiff suffered only mild restrictions to activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, and pace; and Plaintiff experienced no episodes of decompensation that had been of extended duration. R. at 18-19. The ALJ also found "paragraph C" criteria was not satisfied because the record did not indicate a medically documented history of impairments of at least two years' duration that has caused more than minimal limitations of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, as well as repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demand or change in the environment would be predicted to cause the individual to decompensate; or current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. R. at 19-20. The ALJ also considered Plaintiff's obesity and determined it did not meet or medically equal a listing. R. at 20.

Third, the ALJ determined that Plaintiff had the RFC to perform medium work as defined by the SSA regulations, except that Plaintiff could not push and/or pull with his lower extremities on more than a frequent basis, he cannot climb, and he is limited to simple and repetitive non-production pace job tasks without frequent interaction with the general public or co-workers. *Id.*

While the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged by Plaintiff, the ALJ found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons discussed elsewhere in this decision. Specifically, he has had little to no treatment

for his alleged symptoms, he did not stop working because of his impairments, and he has extensive activities of daily living." R. at 21.

The ALJ noted that Plaintiff was in special education classes in school where he demonstrated the ability to work independently, ask for assistance when needed, following instructions, and complete assignments. *Id.* Plaintiff received extra time to complete written assignments, which contributed to his academic success. *Id.* Plaintiff has discontinued taking Ritalin, which he took in school and received a special education diploma. *Id.* The ALJ stated Plaintiff worked at Pizza Hut and he did not stop working because of his impairments, but rather that his hours were reduced to three hours a week and Plaintiff speculates that this reduction in hours was because he performed tasks too slowly. *Id.* Plaintiff's speculation was never confirmed by his employer, he did not have a job coach at that employment, and he testified he was able to perform his job duties without a problem. *Id.* Plaintiff stated he was not able to walk to work after his family moved. R. at 21-22. The ALJ determined that Plaintiff's alleged symptoms were not the reason he stopped working, that Plaintiff did not require a significant degree of extra supervision, and that there was no support for the need of a job coach. R. at 22.

The ALJ gave moderate weight to the opinion of Dr. Rhoad. *Id.* The ALJ observed Dr. Rhoad's opinion that Plaintiff may be capable of performing some type of simple and repetitive work, but due to his learning disability he may benefit from a job-coaching program and that he would require a rather significant degree of extra supervision and assistance with performing tasks on a consistent basis in the work environment. *Id.* Dr. Rhoad also stated Plaintiff's tolerance for stress would be moderately limiting and that he could complete tasks associated with normal workday or workweek if provided appropriate employment opportunities and assistance. *Id.* The ALJ surmised that "[w]hile the record supports a capacity for no more than simple repetitive work,

13

it does not support the need for extra supervision, a job coaching program, and limitations based on stress." *Id.* The ALJ concluded that Plaintiff's activities of daily living were extensive because he plays video games upwards of ten hours per day, can care for his personal needs, wash dishes, vacuum, sweep, cut grass, garden, and lift objects. *Id.* Plaintiff does not have problems with personal care but needs to be reminded to perform these activities. R. at 23.

The ALJ gave moderate weight to the testimony of Plaintiff's mother and does not agree with her statements that Plaintiff needs extra supervision. *Id.* The ALJ noted that Plaintiff's mother testified that she had to remind Plaintiff to perform daily activities and help him shave. *Id.* Plaintiff's mother explained that Plaintiff had to be reminded to do his chores, must receive very specific directions one at a time, and that she had to follow-up on Plaintiff's chores to ensure he completed his tasks correctly. *Id.* She testified that Plaintiff did not have problems with co-workers at Pizza Hut but that he spends a lot of time in his room, is unable to foster friendships, and she agrees with Dr. Rhoad that Plaintiff needs supervision and limited contact with others. *Id.*

The ALJ also considered, but did not assign weight to, the nontreating, nonexamining medical source opinions made by the state agency medical and psychological consultants. *Id.* The consultants found Plaintiff able to perform simple tasks without being required to have frequent interaction with others, but moderate limitations with completing a workday or workweek, as well as working without some additional supervision. R. at 23-24. The consultants determined Plaintiff had mild restrictions to his activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and that he had not experienced any repeated episodes of decompensation. *Id.*

Fourth, the ALJ determined that Plaintiff was unable to perform his past relevant work as a kitchen helper because Plaintiff had a RFC limiting his contact with others. *Id.*

14

Finally, the ALJ found that work existed in significant numbers in the national economy for Plaintiff based on his age, education, work experience, and RFC, including positions such as an order picker, hand packager, and office cleaner. R. at 25.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff's Amended Complaint presents two claims: 1) substantial evidence does not support the ALJ's decision; and 2) The Commissioner's decision is unconstitutional and void because the agency's disability determination in Plaintiff's case violates the Constitution since the

relevant acting commissioners, Appeals Council members, and the ALJ acted as officers of the United States but were not appointed consistent with the Appointments Clause. ECF No. 28 at 1-2.

The Court shall address Plaintiff's second claim first as a finding in Plaintiff's favor on that issue would prompt a remand of Plaintiff's case back to the agency and render moot the Court's review of the ALJ's decision on the merits of Plaintiff's substantive disability claim.

**A. The Court May Not Reach the Merits of Plaintiff's Appointments Clause Challenge.**

The Appointments Clause requires the President with the advice and consent of the Senate "appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States" but states that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the heads of Departments." U.S. CONST. art. II, § 2, cl. 2. Through the Administrative Procedures Act ("APA") Congress created ALJ positions, *see* 5 U.S.C. § 556(b)(3), and directed the head of each agency to appoint ALJs as necessary for proceedings in accordance with 5 U.S.C. §§ 556, 557, *see* 5 U.S.C. § 1302. Plaintiff argues that at the time the ALJ rendered his decision denying Plaintiff benefits on July 30, 2017, the ALJ was an inferior officer of the United States subject to the Appointments Clause, but who had not been appointed by any individual empowered to appoint him under the same, and therefore the ALJs decision in Plaintiff's case is void as a matter of law.[3] ECF No. 33 at 5, 7, 9-11.

Plaintiff's Appointments Clause challenge is grounded primarily in the Supreme Court's recent decision in *Lucia v. SEC*, 138 S. Ct. 2044 (2018). Plaintiff contends that *Lucia*, which addresses the appointment of Security and Exchange Commission ("SEC") ALJs under the

---

[3] Defendant's brief does not address whether SSA ALJs qualify as inferior officers under the Constitution "[b]ecause Plaintiff clearly waived any Appointments Clause challenge." ECF No. 36 at 13 n. 1.

Appointments Clause, applies with equal force to Social Security Administration ALJs. ECF No. 33 at 8-9. In *Lucia*, the SEC instituted proceedings against Raymond Lucia alleging violations of the Investment Advisers Act. *Lucia*, 138 S. Ct. at 2049. Lucia's case was an adversarial proceeding heard by an SEC ALJ who rendered a decision and found that Lucia had violated the Act. On agency appeal Lucia raised the argument that the administrative proceeding and the ALJ's decision were invalid because the ALJ was an inferior officer subject to the Appointments Clause but had not been constitutionally appointed. *Id.* at 2050. The SEC Commission, and later the Court of Appeals for the D.C. Circuit, rejected Lucia's challenge finding that SEC ALJs are mere employees and not "other officers" requiring constitutional appointment. *Id.* Lucia sought a rehearing *en banc* and the Court of Appeals for the D.C. Circuit panel divided evenly on the issue, resulting in a *per curiam* order denying Lucia's claim. This decision directly conflicted with a 2016 decision by the Tenth Circuit Court of Appeals and Lucia filed a Petition for Certiorari to the Supreme Court of the United States, requesting its review to resolve the circuit split. *Id.* Because the parties agreed that the SEC ALJs had not been appointed in accordance with the Appointments Clause of the Constitution, the Court needed only to decide whether SEC ALJs were regular employees or "officers." *Id.* at 2051. The Court determined that SEC ALJ's were Officers of the United States, and therefore, were subject to the Appointments Clause. *Id.* at 2055. The Court then reversed and remanded the case for further proceedings to be heard by a properly appointed ALJ. *Id.* at 2055-56.

In relying on *Lucia*, Plaintiff concedes that the Supreme Court's ruling does not directly address the status of ALJs appointed under 5 U.S.C. § 3105 who do not preside over adversarial administrative hearings or possess power equivalent to those of SEC ALJs, but argues that these ALJs—which include SSA ALJ's—are officers that must be constitutionally appointed. ECF No.

33 at 9-10.  Defendant argues the Court need not reach the ultimate issue of whether SSA ALJs are officers because Plaintiff has waived his constitutional claim by failing to "*timely* challenge the constitutional validity of the appointment of an officer who adjudicated his case." ECF No. 36 at 13 (emphasis added) (quoting *Lucia*, 138 S. Ct. at 2055).  Defendant argues that Plaintiff has failed to exhaust his constitutional claim by failing to raise it during the administrative process, thereby waiving the argument on judicial review.  ECF No. 36 at 12.

### 1. Plaintiff has Waived his Appointments Clause Challenge

As a general principle, a non-jurisdictional constitutional challenge is waived if the party fails to raise it at any time during administrative proceedings. *See Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 676 (6th Cir. 2018) (noting that challenges to the Appointments Clause are non-jurisdictional and should be raised at the administrative level—which ensures there is a true constitutional case presented before the judiciary steps in—and is typically required so long as there is the possibility of some relief for the action complained of); *Bennett v. SEC*, 844 F.3d 174, 188 (4th Cir. 2016) (holding that Congress intended Appointment Clause challenges to go through administrative adjudication before reaching the courts); *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 794-95, 798 (8th Cir. 2013) (finding Appointments Clause challenges are non-jurisdictional and waived if not timely raised before the agency); *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 23 (2012) (holding that courts are excluded from review if constitutional challenges to federal statutes or statutory interpretations are not brought before the agency); *Freytag v. Comm'r*, 501 U.S. 868, 878-79 (1991) (holding that generally litigants must raise all issues at trial); *Id.* at 893-94 (Scalia, J., concurring) ("Appointments Clause claims, and other structural constitutional claims, have no special entitlement to review.  A party waives the right to advance on appeal and nonjurisdictional claim . . . that he fails to raise at trial.").  Further, "[C]ourts

18

require administrative issue exhaustion 'as a general rule' because it is usually 'appropriate under [an agency's] practice.'" *See Sims v. Apfel*, 530 U.S. 103, 109 (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36-37 (1952) and citing to *Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 154-55 (1946) as another example of judicially created issue exhaustion). On this point, Plaintiff argues that regardless of the non-jurisdictional nature of Plaintiff's claim, the holding in *Jones Bros., Inc.* and the related cases are inapplicable because the finding of waiver is predicated on regulatorily or statutorily-required exhaustion and no such regulation or statute requires agency exhaustion in the SSA context. ECF No. 37 at 7-8. The Court finds this argument unpersuasive as the focus of *Jones Bros., Inc.* is the nature of the challenge, rather than the underlying statutory or regulatory scheme. There is no distinction between the Appointments Clause challenge raised in *Jones Bros., Inc.* and Plaintiff's instant Appointments Clause challenge that would cause the nature of Plaintiff's challenge to be jurisdictional. 898 F.3d 669. Further, the fact that in *Jones Bros., Inc.* the Mine Act created exhaustion by statute does not immunize Plaintiff's non-jurisdictional challenge from judicially-created waiver that exists as a general rule.[4] *See Sims v. Apfel*, 530 U.S. 103, 109 (citing *L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 36-37; *Aragon*, 329 U.S. at 154-55). Thus, Plaintiff's Appointments Clause challenge is waived only to the extent judicially-created waiver applies to the instant case.

Plaintiff contends that there exists no regulation or statute that requires issue exhaustion before the Social Security Administration[5] and further argues that the non-adversarial nature of Social Security proceedings makes judicially-created waiver inappropriate. ECF Nos. 33 at 11-

---

[4] In circumstances where a plaintiff failed to raise a non-jurisdictional challenge at the administrative level, courts may in "rare cases" consider a constitutional challenge that would otherwise be waived. *Freytag*, 501 U.S. at 878-79. Plaintiff argues the line of cases addressing non-jurisdictional challenges do not apply to the instant case and, as Defendant notes, fails to argue the instant case is "one of those rare cases" in which the Court should "exercise[] its discretion" and excuse waiver. *Id.* at 878-89; ECF No. 36 at 14; *see generally* ECF Nos. 33, 37.
[5] Defendant does not contest this point.

13; 37 at 7-8. Plaintiff relies heavily on and urges the Court to follow the precedent set forth in *Sims v. Apfel*, 530 U.S. 103 (2000), to extend the *Sims* holding to its logical conclusion, and to find no waiver exists specifically in the context of SSA cases. *Id.* at 10-13.

In *Sims*, the Supreme Court determined that an individual whose benefits were denied by an ALJ did not waive judicial review on certain issues by failing to raise those issues on administrative appeal to the Appeals Council. 530 U.S. at 104-05. Juatassa Sims applied for disability benefits alleging degenerative joint disease and carpal tunnel syndrome. *Id.* at 105. Sims had a hearing before an ALJ and the ALJ denied her claim. *Id.* Sims then appealed to the Appeals Council and submitted a letter arguing the ALJ erred, but the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *Id.* Petitioner then sought judicial review by the U.S. District Court raising three arguments, all of which the court rejected. *Id.* She then appealed to the Court of Appeals for the Fifth Circuit who determined that it lacked jurisdiction as to her second and third arguments because they were not raised before the Appeals Council. *Id.* The Supreme Court granted certiorari to determine whether Social Security claimants waive judicial review of an issue if the claimant fails to present that issue to the Appeals Council. *Id.* In finding there was no issue waiver, the Supreme Court stated the reasons for mandating issue exhaustion are weakened in the context of Social Security because proceedings are non-adversarial and investigatory in nature. *Id.* at 110. However, the Court was careful to limit its holding to only issues that were not raised before the Appeals Council. *Id.* at 107 ("Whether a claimant must exhaust issues before the ALJ is not before us."). As addressed *supra*, Plaintiff further argues that the cases Defendant cites in support of waiver are inapplicable to the case at bar because in those cases waiver is imposed under statutory or regulatory authority, and the SSA includes no such statutory or regulatory requirement. ECF No. 33 at 11-12. Plaintiff argues that the *Sims* rationale

makes it clear that judicially created issue exhaustion is not required at the administrative level at all and that a plaintiff's failure to raise issues before the agency does not trigger waiver of those issues. ECF No. 33 at 10-13. However, *Sims* acknowledges that courts "have imposed an issue-exhaustion requirement even in the absence of a statute or regulation. . . . The basis for a judicially imposed issue-exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Sims*, 530 U.S. 108-09.

Even in the non-adversarial context of the Social Security Administration it makes good sense to bar Plaintiffs from side stepping the agency and permit them to raise issues—that often are best considered by agency experts—for the first time on judicial review by the U.S. District Court. While *Sims* makes a strong case in favor of no waiver, the deliberately narrow application of its holding speaks volumes.[6] *Sims*, 530 U.S. at 107. Further, even though the Fourth Circuit has not addressed issue waiver in the SSA context, since *Sims* was decided, other circuits have determined agency exhaustion and waiver are alive and well. *See, e.g., Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017) (holding that claimants represented by counsel must raise all issues before the ALJ to preserve them on appeal); *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) (finding arguments not raised before the ALJ or Appeals Council are waived); *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003) (holding that, despite the ALJ noting plaintiff's obesity diagnosis, plaintiff's failure to raise obesity as an impairment in his application for disability benefits or at the hearing constitutes waiver on appeal); *Mills v. Apfel*, 244 F.3d 1, 8 (1st Cir. 2001) (declining to extend *Sims* to issues not raise at the ALJ level). A review of lower

---

[6] Notably, Justice Breyer stated in his dissent, "I assume the plurality would not forgive the requirement that a party ordinarily must raise all relevant issues before the ALJ." *Sims*, 530 U.S. at 117 (citations omitted) (Breyer, J., dissenting). Further, while the Court noted that [w]here . . . an administrative proceeding is not adversarial, we think the reasons for a court to require issue exhaustion are much weaker," the Court did not go so far as to say judicially created issue exhaustion is never appropriate where the agency scheme is broadly non-adversarial. *Id.* at 110.

court decisions in the wake of *Lucia*, both within and outside the Fourth Circuit, reveals a growing consensus that plaintiffs who do not raise an Appointments Clause challenge before the agency forfeit the argument on judicial review. *See, e.g., Parker v. Berryhill*, No. 4:17cv143, slip op. at 41 (E.D. Va. Jan. 23, 2019) (finding that the plaintiff forfeited *Lucia* argument by failing to raise it at the administrative level); *Lee v. Berryhill*, No. 2:18-cv-214, slip. op. at 13-14 (E.D. Va. Dec. 20, 2018); *Abbington v. Berryhill*, No. 1:17-00552, 2018 U.S. Dist. LEXIS 210000, at *17-18 (S.D. Ala. Dec. 13, 2018) (same); *Pearson v. Berryhill*, No. 17-4031, 2018 U.S. Dist. LEXIS 206842, at *12 (D. Kan. Dec. 7, 2018) (same); *Mann v. Berryhill*, No. 4:18-CV-3022, 2018 U.S. Dist. LEXIS 205823, at *27 (D. Neb. Dec. 6, 2018) (same); *Britt v. Berryhill*, No. 1:18-cv-00030, 2018 U.S. Dist. LEXIS 202913, at *4 (W.D.N.C. Nov. 30, 2018) (same); *Faulkner v. Comm'r of Soc. Sec.*, No. 1:17-cv-01197, 2018 U.S. Dist. LEXIS 196840, at *7-8 (W.D. Tenn. Nov. 19, 2018) (same); *Avila v. Berryhill*, No. EDCV 17-1440, 2018 U.S. Dist. LEXIS 169528, at *6 n.6 (C.D. Cal. Oct. 1, 2018) (finding that the plaintiff forfeited *Lucia* argument by failing to raise it at the administrative level); *Williams v. Berryhill*, No. 2:17-cv-87, 2018 U.S. Dist. LEXIS 167691, at *6 (S.D. Miss. Sept. 28, 2018) (same); *Davidson v. Comm'r of Soc. Sec.*, No. 2:16-cv-00102, 2018 U.S. Dist. LEXIS 168054, at *4 (M.D. Tenn. Sept. 28, 2018) (same); *Stearns v. Berryhill*, No. C17-2031, 2018 U.S. Dist. LEXIS 156758, at *16 (N.D. Iowa Sept. 14, 2018) (same); *see also Willis v. Comm'r of Soc. Sec.*, No. 1:18-cv-158, 2018 U.S. Dist. LEXIS 206307, at *10 (S.D. Ohio Dec. 6, 2018) (denying plaintiff's motion to amend her complaint to include Appointments Clause challenge because plaintiff failed to raise it at the administrative level); *Flack v. Comm'r of Soc. Sec.*, No. 2:18-cv-501, 2018 U.S. Dist. LEXIS 195834, at *12 (S.D. Ohio Nov. 16, 2018) (same); *Page v. Comm'r of Soc. Sec.*, No. 17-13716, 2018 U.S. Dist. LEXIS 186821, at *9 (E.D. Mich. Oct. 31, 2018). *But see Muhammad v. Berryhill*, No. 18-172, slip op. at 2 (E.D. Pa. Nov. 2, 2018),

ECF No. 37, attach. 1 at 2 (finding plaintiff did not waive his Appointment Clause challenge by failing to raise it before the Social Security Administration).

While there is no statutory or regulatory mandate for exhaustion, application of the general rule of exhaustion is consistent with regulations that govern the SSA. Specific to ALJ assignment, 20 C.F.R. § 404.940 permits a claimant to object to the ALJ assigned to his case *at the earliest opportunity.* If an objection is raised, the ALJ must decide to either hear the case or withdraw. *Id.* Where the ALJ opts not to withdraw the claimant may "present [his] objections to the Appeals Council as reasons why the hearing decision should be revised or a new hearing held before another [ALJ]." *Id.* Further, "[i]f circumstances warrant it . . . the Deputy Commissioner, or his or her delegate" is empowered to assign the case to a different ALJ. 20 C.F.R. § 404.929. This regulation suggests that the timing of raising objections to the ALJ's assignment is important and should be done as soon as possible, but should be raised early enough so that the ALJ or, at the latest, the Appeals Council, can address it. Specific to claims raised or issues addressed, the ALJ identifies issues to be addressed at the hearing, but a claimant may object in writing *at the earliest opportunity.* 20 C.F.R. § 404.939. The ALJ must address issue objections prior to or at the administrative hearing. *Id.* The ALJ may also consider new issues that are later identified so long as the claimant notifies the ALJ of the new issues prior to the mailing of the hearing decision. 20 C.F.R. § 404.946(b)(1). Should a claimant fail to present all matters supporting disability to the ALJ, 42 U.S.C. § 405(g) requires a showing of "good cause for the failure to incorporate such evidence into the record in a prior proceeding" before remand may be permitted. These regulations suggest that the timing of raising objections to the identification of issues to be addressed is important and should be done as soon as possible, and should be raised early enough that the ALJ or, at the latest, the Appeals Council, can address it. Lastly, with respect to certain constitutional

challenges, SSA regulations permit an expedited appeal process wherein a claimant may bypass the Appeals Council and proceed directly to judicial review if "the only factor preventing a favorable determination or decision is a provision in the law."[7]  20 C.F.R. §§ 404.924, 404.923. The record reflects that Plaintiff did not take advantage of any of these opportunities to have his Appointments Clause challenge addressed at the administrative level.

All of these factors lead the Court to conclude that, to preserve Plaintiff's Appointment Clause challenge for judicial review, Plaintiff was required to raise that claim before the Social Security Administration.   Therefore, unlike the plaintiff in *Lucia*, Plaintiff did not raise his Appointments Clause argument "timely" and, unless some exception applies, has forfeited the same. *See Lucia*, 138 S. Ct. at 2055.

*2. No Exception to Judicially-Created Exhaustion Applies to Plaintiff's Case*

Plaintiff argues that two exceptions to judicially-created exhaustion apply to Plaintiff's case. ECF No. 33 at 16.

First, Plaintiff argues that exhaustion requirements in disability cases do not apply where a constitutional issue is presented. *Id.*  Plaintiff relies on *Mathews v. Eldridge*, 424 U.S. 319 (1979), to stand for the proposition that where a constitutional violation is alleged a disability claimant is not required to exhaust his available remedies but may proceed directly to the U.S. District Court.  ECF No. 33 at 16.  In *Eldridge*, the plaintiff's previously awarded disability benefits were terminated absent a pre-termination hearing or opportunity to be heard. *Eldridge*, 424 U.S. at 323. Eldridge did not challenge his termination of benefits administratively, but rather filed a constitutional claim in federal court arguing that the agency's failure to hold a hearing prior

---

[7] This contradicts Plaintiff's argument that it would have been futile for Plaintiff to raise his Appointments Clause challenge before the administration and at least suggests that Social Security can and should address constitutional claims before judicial review. *See* ECF No. 33 at 17-19.

to the termination of benefits violated plaintiff's rights to procedural due process. *Id.* at 324-25. Before addressing the merits, the Supreme Court considered whether, because plaintiff failed to seek an administrative remedy, the U.S. District Court had jurisdiction over the suit. *Id.* at 326-27. The Court determined that the District Court did have jurisdiction and plaintiff was not required to exhaust his constitutional claim administratively because it was "unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context" and because Eldridge's constitutional claim was "entirely collateral to his substantive claim of entitlement." *Id.* at 330. The Court noted that plaintiff's claims were subject to exhaustion requirements but that those requirements were waivable if no further review within the agency was warranted. *Id.* The Court determined that given the circumstances it was appropriate to waive the administrative exhaustion requirement. *Id.* at 330-32.

Plaintiff argues that, like in *Eldridge*, his constitutional claim is collateral to his substantive claim and therefore is not subject to exhaustion. ECF No. 33 at 17. However, Plaintiff's argument fails to account for subsequent authority. Plaintiff's position that constitutional claims are collateral and therefore not subject to exhaustion is inconsistent with *Elgin*, in which the Supreme Court stated that constitutional claims serve as a "vehicle by which [a plaintiff] seek[s] to reverse" an administrative decision are "[f]ar from . . . wholly collateral" to the substantive claims. 567 U.S at 22 (finding that a constitutional challenge is not collateral to the CSRA scheme, because the challenge is by CSRA-covered employees for CSRA-covered employment action, and the relief sought is one that the CSRA routinely affords); *see also Bennett*, 844 F.3d at 187 (rejecting the argument that plaintiff's constitutional claim was wholly collateral because it "arose out of the enforcement proceeding" and "appears to be the vehicle by which [plaintiff] seeks to vacate the

ALJ's initial findings"). This demonstrates that not all constitutional challenges are "wholly collateral" and Plaintiff's interpretation of *Eldridge* that all constitutional claims are wholly collateral is overbroad. The question then becomes whether an Appointments Clause challenge is one that is wholly collateral to a plaintiff's substantive claim. *Lucia* itself resolves this issue. *Lucia* states that an Appointments Clause challenge must be raised "timely" before the agency. 238 S. Ct. at 2055. This establishes that such a claim is subject to exhaustion and, therefore, cannot be wholly collateral to a plaintiff's substantive claim. Further, while the Supreme Court determined in *Eldridge* that the circumstances warranted waiver of the exhaustion requirement, 424 U.S. at 330-32, it also recognized in *Freytag* that courts should only excuse a plaintiff's failure to exhaust his claims administratively in "rare cases," 501 U.S. at 878-79. As stated *supra*, Plaintiff does not argue his is a "rare case." In fact, Plaintiffs is just one in a flood of cases now challenging the appointment of ALJs in the wake of *Lucia*. Therefore, the Court rejects Plaintiff's argument that *Eldridge* creates an exception to the exhaustion requirement for Plaintiff's Appointments Clause challenge.

Second, Plaintiff argues that issue exhaustion is inapplicable to Plaintiff's case because it would have been futile for Plaintiff to raise the Appointments Clause issue before the Social Security Administration. ECF No. 33 at 17. Plaintiff relies on *Bethesda Hospital Association v. Bowen*, 485 U.S. 399 (1988), referenced in Justice Breyer's dissent in *Sims*, 530 U.S. at 115 (Breyer, J., dissenting), as an example of a circumstance in which raising an issue before the agency would be futile, and therefore, a failure to do so would not bar judicial review. *Id.* at 17-18. However, unlike the instant case, in *Bethesda Hospital Association* the plaintiffs merely failed to raise their argument at the first of a two-step agency review process, and while the Supreme Court did find it was futile to raise their argument on review by a fiscal intermediary at the first

step, the Court did not hold that plaintiffs were exempt from raising the issue before the agency at all. 485 U.S. at 404-05. Rather, the Court noted "[t]he [agency] has a role in shaping the controversy that is subject to judicial review" despite lacking "the authority to declare regulations invalid." *Id.* at 406-07. Because the plaintiffs in *Bethesda Hospital Association* did timely raise their claim before the agency upon subsequent review, that case presents a different question than the case at bar and is, therefore, unpersuasive. Further, while individual ALJs may not have the authority to cure defects in their own appointment under the Appointments Clause, such an absence of power is irrelevant as it is clear that if timely brought to the attention of the administration it could have cured such defects by having the Commissioner, a department head, properly appoint existing ALJs without further incident. *Jones Bros., Inc.*, 898 F.3d at 677 ("What matters . . . is that the Commission was fully suited to entertain the [Appointments Clause] claim and remedy any error at the time of [the plaintiff's] petition for Commission review. Confirming the point, the Commission has since preemptively acted to cure this alleged constitutional defect by having every Commissioner ratify the appointment of every [ALJ]. . . . [W]e generally expect parties . . . to raise their as-applied or constitutional-avoidance challenges before the Commission and courts to hold them responsible for failing to do so."); *see also Page*, 2018 U.S. Dist. LEXIS 186821 at *3 (citing to the Solicitor General's memorandum directing all agency heads to properly appoint their ALJs following the *Lucia* decision). Plaintiff relies on an Office of General Counsel Emergency Message to ALJs issued on January 30, 2018, which directs SSA ALJs to acknowledge but refrain from discussing or making findings on Appointments Clause arguments if raised before them, to again demonstrate that it would have been futile to raise his constitutional claim before the ALJ. ECF No. 33 at 18-19, attach. 2. However, this directive came after Plaintiff's ALJ hearing, after the Commissioner rendered her final decision, and after Plaintiff had already appealed to this

27

Court. The fact that ALJs were directed at some later time to not address the same argument Plaintiff has now raised has no bearing on the ALJ's or the Commissioner's ability to address Plaintiff's Appointment Clause challenge. As stated *supra*, it is irrelevant whether the ALJ himself could have addressed Plaintiff's claim. Therefore, Plaintiff has not shown that it would have been futile for him administratively exhaust his constitutional claim.

The Court **FINDS** that Plaintiff has waived his Appointments Clause challenge by failing to raise it during the administrative process. Therefore, the Court need not decide whether the ALJ is an officer who is subject to the Appointments Clause.

## B. The ALJ's Findings Were Not Supported by Substantial Evidence.

Plaintiff argues that the ALJ's decision overall is not supported by substantial evidence, specifically because: (1) the RFC finding failed to include limitations that Plaintiff would require extra supervision or a job coach; (2) the RFC finding failed to account for all the effects of Plaintiff mental limitations in concentration, persistence, and pace; and (3) the step five decision relied on VE testimony that responded to an incomplete hypothetical as the hypothetical left out the need for increased supervision. ECF No. 33 at 27-32. Responsively, the Commissioner argues the ALJ's decision was supported by substantial evidence because: (1) the RFC was proper in that the evidence contradicts Plaintiff's claims that extra supervision was needed; (2) the ALJ properly accounted for limitations in concentration, persistence, and pace because he allowed for simple, repetitive tasks in a non-production paced job with minimal interactions with others; and (3) the ALJ's hypothetical was proper because the need for extra supervision was not supported by the record. ECF No. 36 at 21-28. Because the first and third arguments are related, persuasive, and ultimately dispositive, the undersigned disposes of the second argument first.

*1. The ALJ Did Not Fail to Properly Account for Limitations in Concentration, Persistence, and Pace in Arriving at Plaintiff's RFC*

Plaintiff contends that the ALJ failed to properly account for his moderate mental limitations in concentration, persistence, and pace in Plaintiff's RFC assessment. ECF No. 33 at 29-30. Specifically, Plaintiff argues that the ALJ's assessment is improper as it fails to account for limitations to concentration, persistence, and pace and included only the nonexertional limitations that Plaintiff can perform no more than simple, routine, repetitive tasks with only occasional interaction with the public, co-workers, and supervisors. *Id.* at 29; R. at 20. The Commissioner argues that the ALJ did properly account for Plaintiff's limitations in concentration, persistence, and pace by limiting Plaintiff to simple and repetitive job tasks, non-production paced job tasks, and tasks performed in an environment that did not involve frequent interaction with co-workers or the public. ECF No. 36 at 25.

The ALJ found the Plaintiff had the RFC "to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he cannot push and/or pull his lower extremities on more than a frequent basis; he cannot climb; and he is limited to simple and repetitive non-production pace job tasks without frequent interaction with the general public or co-workers." R. at 20. In assessing a plaintiff's RFC, the ALJ must first identify the individual's functional limitations or restrictions and asses his work-related abilities on a function-by-function basis. *See* SSR 96-8p; *see also Mascio v. Colvin*, 780 F.3d 632 (2015). While Plaintiff is correct that an RFC that limits a plaintiff to "no more than simple, routine, repetitive tasks with only occasional interaction with the public, co-workers, and supervisors" does not directly account for limitations in concentration, persistence, and pace, Plaintiff ignores the essential portion of the ALJ's RFC that does account for these. ECF No. 33 at 29 (summarizing the ALJ's RFC). In determining that the Plaintiff is limited to "simple and repetitive *non-production pace job tasks*" the ALJ properly accounts for

Plaintiff's moderate limitations to concentration, persistence, and pace. *See Mascio*, 780 F.3d at 638. Thus, the Court **FINDS** the ALJ properly considered Plaintiff's limitations to concentration, persistence, and pace in his assessment of Plaintiff's RFC.

*2. Substantial Evidence Does Not Support the ALJ's Finding that Plaintiff Would Not Require Extra Supervision or a Job Coach*

Plaintiff argues that the ALJ erred when, against the consistent weight of the evidence, the ALJ found the record does not support the need for extra supervision or a job-coaching program. ECF No. 33 at 28 (quoting R. at 22). Responsively, the Commissioner argues that that the substantial evidence of record does not support and, in fact contradicts, the proposition that Plaintiff would need extra supervision or a job coach. ECF No. 36 at 21-24.

Whether Plaintiff needs or does not need extra supervision or a job coach to perform tasks consistently is determinative of whether competitive work is available in the national economy, as highlighted by the VE at Plaintiff's hearing:

> Q. If we were to add to the Judge's hypothetical that a person needed a significant degree of extra supervision and assistance in performing tasks on a consistent basis in a work environment, would that have an impact on those jobs?
> A. Yes, it would not be competitive work.
> \* \* \*
> Q. If a person needed a job coach, to be in a job coach program in order to get a job and maintain a job, is that considered to be a sheltered work environment or an accommodated job?
> A. Yes, it is.

R. at 50-51. The ALJ made the affirmative finding that "[t]he evidence also suggests that the claimant *does not require* a significant degree of extra supervision in performing job tasks on a consistent basis. There is also *no support* for the need of a job coach." R. at 22 (emphasis added). Notably, this conclusion does not find there is simply a lack of evidence on whether Plaintiff needs additional supervision, but rather posits that the evidence affirmatively establishes that such extra supervision is not needed. In the Commissioner's Memorandum in Support of the Motion for

Summary Judgment, the Commissioner repeatedly argues that the evidence of record "contradicts" the proposition that Plaintiff needs extra supervision. ECF No. 36 at 23-24. The ALJ's conclusion and the Commissioner's argument on this point either misinterprets, overstates, or ignores the record evidence relied upon to support these conclusions. Thus, this position is not well-taken, and the ALJ's RFC is not supported by substantial evidence. Further, the ALJ's finding used to undermine substantial evidence in the record—that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons discussed elsewhere in this decision"—is nothing more than boilerplate language found in most ALJ unfavorable decisions. R. at 21. Such a boilerplate finding is inapplicable here as the Plaintiff made no statements concerning "the intensity, persistence, and limiting effects of [his] symptoms," and which concerns issues that are wholly inapplicable to the facts and circumstance of the instant case. *Id.*

The ALJ relies on three factors to demonstrate Plaintiff can perform medium work without extra supervision within his RFC: (1) he has had little to no treatment for his alleged symptoms; (2) his prior work at Pizza Hut did not end because of his impairments; and (3) his ability to perform activities of daily living, including playing video games, doing chores, and caring for his personal hygiene. *Id.* This opinion affirmatively finds that Plaintiff does not need extra supervision to perform work tasks and confirms this finding by relying on Plaintiff's academic record and his past employment at Pizza Hut. R. at 21-22. An analysis of these factors demonstrates that substantial evidence does not support the conclusion reached by the ALJ.

a. Treatment for Alleged Symptoms and Plaintiff's Academic Record

The ALJ justified a medium RFC by relying on the absence of treatment for Plaintiff's alleged symptoms. R. at 21. Plaintiff was diagnosed with learning disorder, NOS, and adjustment

disorder with depressed mood. R. at 260. Plaintiff was first deemed eligible for special education services in 1989, has been in special education since age four, largely continued with special education his entire academic career, and ultimately graduated high school with a special diploma in 2005. R. at 208, 246, 256-57. In his special education classes he received additional time within which to complete assignments and received extra supervision by way of the structured special education environment. R. at 47, 246. For the ALJ to use a lack of treatment as a basis for the RFC is misleading in two ways. First, Plaintiff's main diagnosis is a learning disability, which is not the type of impairment that is readily treatable in such a way that could cause the impairment being alleviated or resolved through psychological or medical treatment. Second, the only type of treatment that Plaintiff could benefit from is that which he received throughout his academic career—special education. For the ALJ to find that Plaintiff has had "little to no treatment" for his "alleged symptoms" either misinterprets or misstates the nature of Plaintiff's school career and the treatment rendered as part and parcel of that career, which dates back to his early childhood.

The ALJ also misconstrues Plaintiff's academic record in support of his finding that Plaintiff does not need additional supervision. R. at 22. The ALJ states that "the record . . . does not support his need for extra supervision," in part because "[Plaintiff's] academic records also indicate an ability to work independently." *Id.* As noted by Plaintiff's mother, special education is an environment that, as a matter of course, offers extra supervision. R. at 47. The November 30, 2004 assessment does state that "[Plaintiff] demonstrates the ability to work independently" and "will as [sic] for assistance when needed." However, as the ALJ himself acknowledges, such independence is short lived in favor of additional supervision.[8] R. at 19, 247. Further, the assessment identified that "[a] significant and unusual discrepancy between [Plaintiff's] ability

---

[8] In summarizing Plaintiff's academic records, the ALJ noted that Plaintiff "needed some prompting to stay on track, but demonstrated the ability to work independently." R. at 19.

and achievement was noted in the areas of reading, math, and language." R. at 247.  This finding was not addressed by the ALJ.  Therefore, Plaintiff's academic record does not support the ALJ's conclusion that Plaintiff does not require additional supervision.

### b. Plaintiff's Employment at Pizza Hut

Plaintiff worked at Pizza Hut between 2005 and 2010 as a food preparer.  R. at 257. Already working part-time, Plaintiff's hours were substantially reduced by his employer from thirty hours to only two to three hours per week.  R. at 33, 37, 257.  Plaintiff and his mother both believed that the reduction in hours was due to Plaintiff's inability to keep up with the pace of his work, although his employer never offered a reason for the change in hours.  R at 37, 41, 44, 257. Plaintiff was able to walk to work, but then moved and was required to take public transportation or have a family member drive him to work, which "cost money."  R. at 33, 37.  Plaintiff stated that one of the reasons he ultimately left his employment at Pizza Hut was because, after moving, the cost of travel to and from work was too great.  R. at 37.

The ALJ justified his finding that Plaintiff does not need extra supervision to perform work tasks on the fact that he did not have it at Pizza Hut, and his conclusion that Plaintiff did not stop working there because of his impairments.[9]  R. at 21.  The ALJ substantially relied on Plaintiff's employment at Pizza Hut to dismiss the evidence that supports Plaintiff's need for extra supervision, most notably the opinions of consultative examiner Dr. Rhoad and the two state agency consultants.[10]  Id.  The ALJ gives two reasons that the Pizza Hut employment does not

---

[9] The ALJ appears to conflate the reason for Plaintiff leaving this employment and the reason for his reduction in hours, largely dismissing Plaintiff's and his mother's explanations as speculation.  See R. at 36-38.  While Plaintiff and his mother did speculate that the reason Plaintiff's hours were reduced was because of the slowness of his work, Plaintiff's reason for leaving Pizza Hut was not speculation.  Id.  The only evidence in the record establishes that Plaintiff left Pizza Hut because it was no longer economically feasible to continue after the significant reduction in his hours.  R. at 37.  Interestingly, evidence in the record also shows that Plaintiff's only other employment, at a Farm Fresh grocery store, also terminated after Plaintiff's hours had been significantly reduced.  R. at 247
[10] These opinions are discussed in more detail infra.

33

support those medical findings: (1) Plaintiff worked at Pizza Hut for several years without extra supervision, albeit at substantially reduced hours over time, and (2) Plaintiff did not have a job coach at that job. R. at 22. While these facts might go some way towards supporting a conclusion that, contrary to the expert opinion of Dr. Rhoad, extra supervision is not necessary for Plaintiff to perform work tasks, standing alone, as these facts do, they do not constitute substantial evidence to support the ALJ's conclusion. As discussed *infra*, Plaintiff's employment at Pizza Hut is the only evidence of record that suggests Plaintiff may be able to work without additional supervision, and, in light of the fact that Plaintiff's hours were cut so drastically he was essentially forced to quit, this evidence is hardly evidence at all, let alone substantial evidence. As discussed herein, no other evidence supports the ALJ's conclusion that Plaintiff can perform work activities without additional supervision.

### c. Plaintiff's Ability to Perform Activities of Daily Living

The ALJ found that Plaintiff's "activities of daily living have been extensive." R. at 22. The ALJ noted:

> [Plaintiff] plays video games on the computer at least 10 hours every day and is able to care for his persona needs. He stated that he plays the 'World of Warcraft' game. He can perform housework including washing dishes, vacuuming, sweeping, cutting grass, gardening, and lifting objects for his mother and father when needed. He also watches television. He has never had a driver's license, his mother usually provides him transportation. He shops with his mother. He does not have problems with personal care, although needs to be reminded to perform these activities.

R. at 22-23. The ALJ also noted the testimony of Plaintiff's mother, Ms. Bennett, about the circumstances of Plaintiff's daily living activities:

> [Ms. Bennett] described how she must remind the claimant to perform daily activities like bathing, wearing deodorant, and shaving. She helps him shave because he misses part of his face. She stated that he has daily chores that he must complete and while he does not have problems completing tasks, he needs to be reminded to begin the tasks. He must also receive instructions one at a time, which

> very specific directions. She then has to go back and make sure that he has correctly
> completed tasks, and explained that he needs to be reminded to tie trash bags
> correctly or she needed to make sure that he has not missed any parts of the yard
> after he has mowed the lawn. She does not think he could live independently, pay
> bills, or care for himself.

R. at 23. The ALJ gives Ms. Bennett's testimony about Plaintiff's activities of daily living moderate weight, but fails to give a reason for the weight assigned to this evidence. *Id.* Further, the ALJ "does not agree with the need for extra supervision [asserted by Ms. Bennett], though, as previously explained." *Id.*; *see also* R. at 21-22 (finding Plaintiff does not need extra supervision by relying on Plaintiff's academic record and his past employment at Pizza Hut).[11]

The ALJ disregards this evidence of record that establishes the extremely structured environment Ms. Bennett created for him at home which permits Plaintiff to successfully complete his chores. R. at 42-47. The ALJ appears, improperly, to rely on the mere fact that Plaintiff does these activities without considering the context in which he completes these tasks—only with the substantial supervision of his mother in prompting, overseeing, and following up on the tasks Plaintiff is required to do at home.[12] The ALJ gives no explanation for his rejection Ms. Bennett's testimony about his activities of daily living, and as explained *supra*, reliance on Plaintiff's academic record and on his past employment at Pizza Hut is not a sufficient bases to discount her testimony about Plaintiff's daily living activities and her assertion that "[Plaintiff] does need supervision and it's been like that way his whole life. I mean he was always in special education, so that's supervision. At home, he needs supervision. So he would need supervision at the workplace to make sure he got all his tasks completed and done." R. at 47.

---

[11] The Court has previously addressed this evidence as a basis for the ALJ's decision *supra* and finds that the evidence upon which the ALJ relies, Plaintiff's employment at Pizza Hut and his academic record, do not support the ALJ's conclusion that Plaintiff can work absent additional supervision.

[12] The fact that Plaintiff is able to play hours of a very rudimentary-level video game and watch television does not indicate any ability of the Plaintiff to stay on task or work independently in the workplace.

d. Plaintiff's Medical Records

Dr. Rhoad performed a consultative evaluation at the behest of Disability Determination Services ("DDS"). His consultative examination included a review of the record, a mental status evaluation, psychological and intellectual testing, a substance abuse assessment, and a credibility determination. R. at 256-61. Dr. Rhoad diagnosed Plaintiff on Axis I with a learning disorder, NOS, and adjustment disorder with depressed mood. R. at 260. Dr. Rhoad diagnosed Plaintiff on Axis II with personality disorder, NOS. *Id.* Significantly, because of Plaintiff's mental impairment, Dr. Rhoad concluded:

> Due to his history of learning disability and his overall presentation, he may benefit from the assistance of a job coaching program. He seemingly will require a rather significant degree of extra supervision and assistance in the performing of tasks on a consistent basis in the work environment. He may be capable of accepting instructions from supervisions. His interactions with coworkers and the public in general will be quite superficial due to his social skills deficits. His stress tolerance seems to be moderately limiting and likely will be affected by the work environment and job expectations. He may be able to complete the tasks associated with a typical workday or workweek if provided appropriate employment opportunities and the above-mentioned assistance.

R. at 261. Dr. Rhoad determined Plaintiff required extra supervision or a job coach to permit him to perform some type of simple and repetitive assignments. R. at 261. Patricia Bruner, Ph.D., and David Deaver, Ph.D., reviewed Plaintiff's medical records to assist in making a determination on Plaintiff's disability claims at the initial level and upon reconsideration, respectively. R. at 64-101. Dr. Bruner and Dr. Deaver both concluded that Plaintiff "would have moderate limitations in his ability to work without some additional supervision." R. at 64, 87. The record reflects that these are the only medical opinions regarding Plaintiff's mental health condition and resulting limitations.

The ALJ assigned moderate weight to the opinion of Dr. Rhoad because—citing again to Plaintiff's unsupervised work at Pizza Hut and his academic record as support—"[w]hile the

36

record supports a capacity for no more than simple and repetitive work, it does not support the need for extra supervision, a job coaching program, and limitations based on stress." R. at 22. The ALJ did not discuss what weight he assigned to the opinions of the non-examining state agency consultants Dr. Bruner and Dr. Deaver, but agrees with their findings regarding "paragraph B" criteria. R. at 23-24. Further, the ALJ notes, but does not directly address, their identical conclusion that Plaintiff would need additional supervision. *Id.* In reaching his conclusion that these opinions, at least with respect to the need for extra supervision, should be disregarded, the ALJ either misinterprets the facts in the record or cherry-picks certain evidence and uses it out of context to support his conclusions.

### e. The ALJ's RFC is Not Support by Substantial Evidence

In the first instance, the ALJ's reliance on boilerplate language that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons discussed elsewhere in this decision" is simply inapplicable to the specific facts of this case. R. at 21. In his testimony, Plaintiff never testified about his "symptoms" and never made any claims or contentions regarding how his day-to-day living was affected by the severe impairments found by the ALJ. This boilerplate conclusion, which is likely appropriate in the typical case, is simply not appropriate in the context of Plaintiff's claim.

Second, and as discussed, Plaintiff's entire school history demonstrates he "received treatment" for his learning disability in the only way one can receive treatment for such a disability. He was in the special needs program of the Virginia Beach City School system starting at age four through his graduation in 2005, at which time he received a special high school diploma. R. at 208. To find that Plaintiff received "little or no treatment" appears to be another boilerplate finding

that is inapplicable to the circumstances of Plaintiff's case and that directly contradicts the ALJ's own discussion of Plaintiff's academic record, R. at 22, and the academic record itself, R. at 247, which states that Plaintiff had the *ability* to work independently, but that a significant disparity existed between Plaintiff's *ability* and his academic *achievement*.

Third, while the ALJ correctly noted that Plaintiff engaged in certain activities of daily living, he omitted the context in which those activities are performed. R. at 22-23. This omission is unexplained by the ALJ and appears to be another instance of the ALJ cherry-picking facts to support a conclusion of non-disability. For instance, Plaintiff's mother testified that, while Plaintiff can bathe himself, shave, use deodorant, and perform some chores, he has to be supervised in order to ensure he performs these tasks adequately. R. at 44-47. The ALJ acknowledged this testimony in his decision but gave it only moderate weight. R. at 19, 23. The ALJ offered no specific justification for this decision, but merely offered the conclusory statement that the record "does not support the need for extra supervision." R. at 22. Further, to the extent the ALJ relied on Plaintiff's activities of playing the World of Warcraft video game and watching television as evidence of Plaintiff's ability to concentrate, thereby undermining Dr. Rhoad's opinion that Plaintiff needed extra supervision to perform work tasks, this reliance is misplaced. There is no evidence to suggest one way or the other about Plaintiff's ability to concentrate on either television programs or his video games. *See Ellis v. Colvin*, No. 5:13cv43, 2014 WL 2862703, at *12 (W.D. Va. June 24, 2014) (finding that activities of daily living do not undermine a medical opinion when those activities of daily living are not inconsistent with limitations outline by the medical expert); *accord Nickodam v. Astrue*, No. 2:10cv28, 2011 WL 652460, at *4 (W.D. Va. Feb. 15, 2011). Plaintiff's activities of playing video games and watching television, without more evidence, is

simply not inconsistent with Dr. Rhoad's opinion that Plaintiff needs extra supervision to perform work tasks.

At bottom, the ALJ's conclusion that extra supervision is not required appears to be based on only two specific affirmative findings: (1) "[t]he claimant was able to perform his job duties at Pizza Hut without extra supervision or a job coach" and (2) "[h]is academic record also indicates an ability to work independently, especially with simple tasks." R. at 22. As previously discussed, the ALJ's citation to Plaintiff's academic record in support of his opinion lacks context. Plaintiff's academic record is not inconsistent, and in fact supports, the conclusions of Dr. Rhoad, Dr. Bruner, Dr. Deaver, and Ms. Bennett that Plaintiff requires extra supervision to perform work tasks. Thus, the ALJs reliance on Plaintiff's employment at Pizza Hut without extra supervision or a job coach stands alone as a reason to discount the opinions of the consultative examiner and the state agency consultants. This sole fact simply does not constitute the "substantial evidence" necessary to support the ALJ's finding. Since the requirement of extra supervision would eliminate all jobs in the national economy according to the testimony of the VE, the ALJ's error was not harmless. Therefore, the Court **FINDS** that substantial evidence does not support the ALJ's findings.[13]

## VI. RECOMMENDATION

Substantial evidence, which the ALJ either disregarded or misinterpreted, supports a finding that Plaintiff is disabled within the meaning of the SSA. Remand would serve no purpose, as there are no issues for the ALJ to reconsider or further explain. *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974) (holding that to "reverse without remanding where the record does

---

[13] Plaintiff also asserts that the ALJ erred in presenting the VE with an incomplete hypothetical that omitted Plaintiff's need for additional supervision. ECF No. 33 at 31-32. The proposed hypothetical was presented to the VE by Plaintiff's counsel at the hearing and the VE responded by testifying that such a limitation would remove Plaintiff from competitive work. R. at 50-51. The undersigned has addressed such evidence in reaching its findings, and thus, this claim of error is moot.

not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."). For these reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 32, be **GRANTED**, the Commissioner's Motion for Summary Judgment, ECF No. 35, be **DENIED**, and an Order be entered awarding Plaintiff disability benefits.

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
February 15, 2019